# 24-773(L)

## 24-1497 (CON)

# United States Court of Appeals
# for the Second Circuit

THE PEOPLE OF THE STATE OF NEW YORK, by LETITIA JAMES, Attorney General of the State of New York,

*Plaintiff-Appellee,*

UNITED STATES OF AMERICA,

*Intervenor-Plaintiff,*

v.

ARM OR ALLY, LLC,

*Defendants-Appellants.*

*(caption continues inside front cover)*

On Appeal from the United States District Court
for the Southern District of New York

## BRIEF FOR APPELLEE

BARBARA D. UNDERWOOD
 *Solicitor General*
ESTER MURDUKHAYEVA
 *Deputy Solicitor General*
KWAME N. AKOSAH
 *Assistant Solicitor General*
 *of Counsel*

LETITIA JAMES
 *Attorney General*
 *State of New York*
Attorney for Appellee
28 Liberty Street
New York, New York 10005
(212) 416-8025

Dated: July 10, 2024

*(caption continues from front cover)*

BLACKHAWK MANUFACTURING GROUP, INC., AKA 80 PERCENT
ARMS, INC., AKA 80 PERCENT ARMS, SALVO TECHNOLOGIES, INC.,
AKA 80P BUILDER, AKA 80P FREEDOM CO., BROWNELLS, INC.,
AKA BROWNELLS, AKA BOB BROWNELLS, GS PERFORMANCE, LLC,
AKA GLOCKSTORE, AKA GSPC, KM TACTICAL, PRIMARY ARMS, LLC.,
RAINER ARMS, LLC, ROCK SLIDE USA, LLC,

*Defendants-Appellants.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................... iv

PRELIMINARY STATEMENT ................................................................ 1

ISSUES PRESENTED .............................................................................. 4

STATEMENT OF THE CASE ................................................................. 5

    A.    Statutory and Regulatory Background ................................... 5

        1.    Laws regulating the sale of firearms ............................ 5

        2.    Laws governing products used to make untraceable firearms ........................................................................ 10

            a.    Federal regulations requiring serialization of unfinished frames and receivers ............................ 11

            b.    State and local laws prohibiting the sale and possession of unfinished frames and receivers in New York .................................................... 15

        3.    The Protection of Lawful Commerce in Arms Act (PLCAA) ...................................................................... 17

    B.    Factual Background ............................................................. 19

        1.    Defendants promote and sell unfinished frames and receivers used to make untraceable weapons ................. 19

        2.    Defendants sell unfinished frames and receivers into New York without performing background checks or exercising any other controls .......................... 21

i

**Page**

C.  Procedural History .................................................................23

    1.  The Office of the New York Attorney General (OAG)'s civil enforcement action ....................................23

    2.  The denial of defendants' motions to dismiss .................24

    3.  Defendants' attempt to obtain interlocutory appellate review ............................................................26

SUMMARY OF ARGUMENT ....................................................27

ARGUMENT ................................................................................30

POINT I

DEFENDANTS' CHALLENGE TO THE FEDERAL REGULATORY STATUS OF THEIR PRODUCTS IS NOT A BASIS TO DISMISS THE COMPLAINT AND LACKS MERIT IN ANY EVENT .......................................30

A.  The Regulatory Status of Defendants' Products Is Not Dispositive as to Any of OAG's Claims...................................30

B.  The Complaint Adequately Alleges That Defendants' Products Are Firearms Under Federal Law............................33

    1.  The complaint alleges that defendants' products are "designed" or "may readily be converted" to expel a projectile, within the meaning of 18 U.S.C. § 921(a)(3)(A).................................................................34

    2.  The complaint alleges that defendants' products are "the frame or receiver" of a weapon within the meaning of 18 U.S.C. § 921(a)(3)(B). ..............................37

    3.  Defendants' arguments to the contrary are meritless. ....38

**Page**

POINT II

PLCAA DOES NOT PREEMPT OAG'S CIVIL ENFORCEMENT ACTION ...... 44

A. OAG's Statutory Claims Are Not "Qualified Civil Liability Actions" Within the Meaning of PLCAA. ............... 45

B. Alternatively, OAG's Statutory Claims Can Proceed Under PLCAA's Predicate Exception. .................... 47

    1. OAG's claims are based on violations of statutes applicable to the sale or marketing of firearms. ............. 47

    2. The complaint alleges that defendants knowingly violated the law and that their violations were the proximate cause of the identified harms. ........................ 51

POINT III

IN THE ALTERNATIVE, THIS COURT SHOULD DISMISS THE APPEALS FOR LACK OF APPELLATE JURISDICTION ............................... 55

A. Defendants' Petition for Interlocutory Appeal Under 28 U.S.C. § 1292(b) Should Be Denied. ...................... 55

B. This Court Lacks Jurisdiction over Defendants' Noticed Appeal. .................................................................. 59

CONCLUSION ...................................................................... 67

# TABLE OF AUTHORITIES

**Cases**                                                                  **Page(s)**

*Abney v. United States,*
    431 U.S. 651 (1977)................................................................. 63

*Abramski v. United States,*
    573 U.S. 169 (2014)......................................................... 6-7, 10

*Amore v. Novarro,*
    624 F.3d 522 (2d Cir. 2010) ................................................. 66

*Anderson v. City of Boston,*
    244 F.3d 236 (1st Cir. 2001) ................................................ 62

*Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Ams.,*
    426 F. Supp. 2d 125 (S.D.N.Y. 1995)................................... 58

*Ashcroft v. Mattis,*
    431 U.S. 171 (1977)................................................................. 33

*Blue Ridge Invs., L.L.C. v. Republic of Argentina,*
    735 F.3d 72 (2d Cir. 2013) ................................................... 62

*Bond v. United States,*
    572 U.S. 844 (2014)................................................................. 44

*City of New York v. Beretta U.S.A. Corp.,*
    524 F.3d 384 (2d Cir. 2008) ..................................... 47-50, 66

*City of New York v. Mickalis Pawn Shop, LLC,*
    645 F.3d 114 (2d Cir. 2011) ................................................. 66

*Consumer Fin. Prot. Bureau v. Community Fin. Servs. Ass'n*
    *of Am., Ltd.,*
    601 U.S. 416 (2024)................................................................ 59

*Coopers & Lybrand v. Livesay,*
    437 U.S. 463 (1978)................................................................. 60

iv

| **Cases** | **Page(s)** |
| --- | --- |

*Digital Equip. Corp. v. Desktop Direct, Inc.,*
  511 U.S. 863 (1994)......................................................60, 64-65

*Division 80, LLC v. Garland,*
  No. 3:22-cv-148, 2022 WL 3648454 (S.D. Tex. Aug. 23, 2022)...........15

*Dixon v. United States,*
  548 U.S. 1 (2006)...................................................................51

*Doe v. Karadzic,*
  No. 93-cv-878, 1999 WL 6360 (S.D.N.Y. Jan. 7, 1999)......................57

*Estados Unidos Mexicanos v. Smith & Wesson Brands, Inc.,*
  91 F.4th 511 (1st Cir. 2024)..................................................54

*Food & Drug Admin. v. Alliance for Hippocratic Med.,*
  602 U.S. 367 (2024)..............................................................59

*Garland v. Blackhawk Mfg. Grp., Inc.,*
  144 S. Ct. 338 (2023)...........................................................58

*Garland v. VanDerStok,*
  144 S. Ct. 1390 (2024)..........................................................15

*Garland v. VanDerStok,*
  144 S. Ct. 44 (2023).......................................................15, 58

*German ex rel. German v. Federal Home Loan Mortg. Corp.,*
  896 F. Supp. 1385 (S.D.N.Y. 1995)..........................................56

*Hamilton v. Beretta U.S.A Corp.,*
  96 N.Y.2d 222 (2001) ........................................................9, 32

*Hess v. Port Auth. Trans-Hudson Corp.,*
  513 U.S. 30 (1994)...............................................................66

*Huddleston v. United States,*
  415 U.S. 814 (1974).............................................................10

| Cases | Page(s) |
|---|---|

*Ileto v. Glock, Inc.,*
565 F.3d 1126 (9th Cir. 2009) .................................................. 45, 50, 67

*In re A2P SMS Antitrust Litig.,*
No. 12-cv-2656, 2015 WL 876456 (S.D.N.Y. Mar. 2, 2015) ............... 56

*In re Academy, Ltd.,*
625 S.W.3d 19 (Tex. 2021) .................................................... 60

*In re Agent Orange Prod. Liab. Litig.,*
745 F.2d 161 (2d Cir. 1984) ................................................. 62

*In re Initial Pub. Offerings Sec. Litig.,*
471 F.3d 24 (2d Cir. 2006) .................................................. 61

*In re McAllen Med. Ctr.,*
275 S.W.3d 458 (Tex. 2008) .............................................. 60-61

*In re World Trade Ctr. Disaster Site Litig.,*
521 F.3d 169 (2d Cir. 2008) ................................................ 60

*Jennifer Matthew Nursing & Rehab. Ctr. v. U.S. Department
of Health & Hum. Servs.,*
607 F.3d 951 (2d Cir. 2010) ................................................ 33

*Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave
Achille Lauro in Amministrazione Straordinaria,*
921 F.2d 21 (2d Cir. 1990) ................................................. 56

*Laborers Loc. 17 Health & Benefit Fund v. Philip Morris, Inc.,*
191 F.3d 229 (2d Cir. 1999) ................................................ 52

*Liberty Synergistics Inc. v. Microflo Ltd.,*
718 F.3d 138 (2d Cir. 2013) ................................................ 63

*Liparota v. United States,*
471 U.S. 419 (1985) ....................................................... 53

| Cases | Page(s) |
|---|---|

*Loper Bright Enters., Inc. v. Raimondo,*
No. 22-451, 2024 WL 3208360 (U.S. June 28, 2024)..........................41

*Matter of People v. Ivybrooke Equity Enters., LLC,*
175 A.D.3d 1000 (4th Dep't 2019) ......................................................31

*Medtronic, Inc. v. Lohr,*
518 U.S. 470 (1996)...................................................................44-45

*Midland Asphalt Corp. v. United States,*
489 U.S. 794 (1989).............................................................59-60, 63

*Minnesota v. Fleet Farm LLC,*
No. 22-cv-2694, 2023 WL 4203088 (D. Minn. June 27, 2023)............54

*Mitchell v. Forsyth,*
472 U.S. 511 (1985)...................................................................64

*Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco,*
*Firearms & Explosives,*
No. 3:22-cv-116, 2022 WL 3597299 (D.N.D. Aug. 23, 2022) .............15

*Murthy v. Missouri,*
No. 23-411, 2024 WL 3165801 (U.S. June 26, 2024)..........................59

*National Shooting Sports Found., Inc. v. James,*
604 F. Supp. 3d 48 (N.D.N.Y. 2022) ...................................................51

*Nixon v. Fitzgerald,*
457 U.S. 731 (1982)...................................................................64

*Petersen Energía Inversora S.A.U. v. Argentine Republic & YPF S.A.,*
895 F.3d 194 (2d Cir. 2018) ...............................................................55

*Rehaif v. United States,*
588 U.S. 225 (2019)...................................................................52-53

*Ruan v. United States,*
597 U.S. 450 (2022)...................................................................53

| Cases | Page(s) |
|---|---|

*Soto v. Bushmaster Firearms Int'l, LLC,*
331 Conn. 53 (2019) ............................................................... 49-50

*State v. Cortelle Corp.,*
38 N.Y.2d 83 (1975) ............................................................... 31

*United States v. 16,179 Molso Italian .22 Caliber Winlee Derringer Convertible Starter Guns,*
443 F.2d 463 (2d Cir. 1971) ............................................... 35

*United States v. Dotson,*
712 F.3d 369 (7th Cir. 2013) ............................................. 35

*United States v. Drasen,*
845 F.2d 731 (7th Cir. 1988) ............................................. 35

*United States v. Hardin,*
889 F.3d 945 (8th Cir. 2018) ............................................. 35

*United States v. Mullins,*
446 F.3d 750 (8th Cir. 2006) ............................................. 35

*United States v. Rahimi,*
No. 22-915, 2024 WL 3074728 (U.S. June 21, 2024) ........................ 59

*United States v. Rivera,*
415 F.3d 284 (2d Cir. 2005) .................................... 11, 34-35

*United States v. Sicignano,*
78 F.3d 69 (2d Cir. 1996) ................................................ 52

*United States v. Simels,*
654 F.3d 161 (2d Cir. 2011) .............................................. 34

*United States v. Texas,*
599 U.S. 670 (2023) ...................................................... 59

*United States v. Weintraub,*
273 F.3d 139 (2d Cir. 2001) ........................................ 51-52

**Cases** Page(s)

*United States v. Weiss,*
 7 F.3d 1088 (2d Cir. 1993) ................................................... 65

*Van Cauwenberghe v. Biard,*
 486 U.S. 517 (1988) ........................................................ 63-64

*VanDerStok v. Garland,*
 680 F. Supp. 3d 741 (N.D. Tex. 2023) .................................. 15

*VanDerStok v. Garland,*
 86 F.4th 179 (5th Cir. 2023) ......................................... 15, 39

*Will v. Hallock,*
 546 U.S. 345 (2006) ...................................................... 60, 66

**Statutes**

*Federal*

Pub. L. No. 90-351, 82 Stat. 197 (1968) ................................. 6

Pub. L. No. 107-296, 116 Stat. 2135 (2002) .......................... 12

15 U.S.C.
 § 7901 .............................................................................. 64
 § 7902 .............................................................................. 17
 § 7903 ....................................................................... passim

18 U.S.C.
 § 921 ......................................................................... passim
 § 922 ............................................................................. 6-7
 § 923 ...................................................................... 6-7, 19

28 U.S.C.
 § 1292 .......................................................................... 55-56
 § 1604 .............................................................................. 65

49 U.S.C. § 30502 ................................................................ 65

**Statutes**                                                    **Page(s)**

*New York State*

Executive Law
 § 63 ........................................................................ 9
 § 230 ...................................................................... 7

General Business Law
 § 349 ...................................................................... 9
 § 350 ...................................................................... 9
 § 875-e ................................................................... 8
 § 875-f .................................................................... 8
 § 898-b ................................................ 8-9, 31-32, 50-51

Penal Law
 § 265.00 ................................................................ 16
 § 265.01 ................................................................ 16
 § 265.07 ................................................................ 16
 § 265.60 ................................................................ 16
 § 265.61 ................................................................ 16
 § 265.63 ................................................................ 16
 § 265.64 ................................................................ 16
 § 400.00 .................................................................. 8

Administrative Code of City of N.Y.
 § 10-301 ................................................................ 16
 § 10-314 ................................................................ 16

**Regulations**

27 C.F.R.
 § 478.11 ............................................................ 14, 43
 § 478.12 ............................................................ 14, 43

Commerce in Firearms and Ammunition,
 33 Fed. Reg. 18,555 (Dec. 14, 1968) ................................. 11

Definition of "Frame or Receiver" and Identification of
 Firearms, 87 Fed. Reg. 24,652 (Apr. 26, 2022) ............... 10-11, 41

## Miscellaneous Authorities            Page(s)

114 Cong. Rec. 13647 (1968) .................................................... 8

151 Cong. Rec. (2005)
    17371 .................................................................... 17, 46
    18084 ......................................................................... 45
    18085 ......................................................................... 18
    18086 ......................................................................... 17
    18920 ......................................................................... 46

*Black's Law Dictionary* (12th ed. 2024) (Westlaw)................. 48

Bureau of Alcohol, Tobacco, Firearms and Explosives, *Are
    "80%" or "unfinished" receivers illegal?* (Apr. 6, 2020),
    https://www.atf.gov/firearms/qa/are-%E2%80%9C80%E2%80
    %9D-or-%E2%80%9Cunfinished%E2%80%9D-receivers-
    illegal ...................................................................... 42

Bureau of Alcohol, Tobacco, Firearms and Explosives, *Five Fast
    Facts About the National Tracing Center* (Feb. 16, 2023),
    https://www.atf.gov/resource-center/infographics/five-fast-
    facts-about-national-tracing-center ....................................... 7

Bureau of Alcohol, Tobacco, Firearms and Explosives, Ruling
    2015-1 - Manufacturing and Gunsmithing (Jan. 2,
    2015), https://www.atf.gov/file/11711/download ............... 13, 42

16 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper,
    Federal Practice and Procedure § 3937
    (3d ed., June 2024 update) ............................................ 62-63

Chelsea Parsons & Arkadi Gerney, Ctr. for Am. Progress,
    *Report: The Bureau and the Bureau* (2015),
    https://www.americanprogress.org/wp-
    content/uploads/sites/2/2017/03/ATF-report-webfinal2.pdf.............. 12

Franklin E. Zimring, *Firearms and Federal Law: The Gun
    Control Act of 1968*, 4 J. Legal Stud. 133 (1975).................. 5

H.R. Rep. No. 90-1577 (1968)................................................... 8

**Miscellaneous Authorities**                                **Page(s)**

Senate Introducer's Mem., *in* Bill Jacket for ch. 237 (2021) .................51

Sponsor Mem. for S. 14A (N.Y. 2021) ......................................17

Tr. of Hr'g Before the City Council Comm. on Pub. Safety
   (June 27, 2019), https://legistar.council.nyc.gov/View.ashx
   ?M=F&ID=7538641&GUID=B1CB7207-BD20-4330-BF12-
   7BD55D40755A................................................................16

*Webster's Third New International Dictionary of the English
   Language Unabridged* (1968) .......................................35-36

## PRELIMINARY STATEMENT

Plaintiff-respondent People of the State of New York, by Letitia James, Attorney General (OAG) brought this civil enforcement action against ten manufacturers and sellers of unfinished frames and receivers.[1] Defendants' products are used to make "ghost guns," which are fully operative firearms that lack serial numbers and are thus untraceable when used in a crime. OAG alleges that, since at least 2016, defendants have marketed and sold thousands of unfinished frames and receivers into New York without conducting background checks or taking any steps to verify their customers' legal ability to purchase a gun, all in violation of local, state, and federal law.

In February 2024, the U.S. District Court for the Southern District of New York (Furman, J.) denied, in large part, defendants' motions to dismiss OAG's action. As relevant here, the district court concluded that the products manufactured, marketed, and sold by defendants are

---

[1] The nine defendants-appellants are Arm or Ally, LLC; Blackhawk Manufacturing Group, Inc.; Salvo Technologies, Inc.; Brownells, Inc.; GS Performance, LLC; KM Tactical; Primary Arms, LLC; Rainer Arms, LLC; and Rock Slide USA, LLC. The district court has entered a default judgment against the tenth defendant, Indie Guns, LLC, (S.D.N.Y. ECF No. 250), and Indie Guns is not a party to this interlocutory appeal.

"firearm[s]" within the meaning of 18 U.S.C. § 921(a)(3) and therefore cannot be sold lawfully without serial numbers and compliance with background check requirements. The court further held that the federal Protection of Lawful Commerce in Arms Act (PLCAA) did not preempt OAG's claims.

Defendants filed this interlocutory appeal, arguing that this Court has jurisdiction under the collateral-order doctrine. Defendants also moved the district court to certify an interlocutory appeal under 28 U.S.C. § 1292(b). The district court granted the motion, though it warned that whether certification is appropriate is a close question and noted that certification would not be warranted for the PLCAA question alone.[2]

If this Court reaches the merits of the appeal, it should affirm the denial of defendants' motions to dismiss. First, the question of whether defendants' unfinished frames or receivers are "firearms" under federal law is not a proper subject for interlocutory review because none of the state-law causes of action brought by OAG depends solely on the existence

---

[2] This Court referred defendants' petition for leave to appeal to the panel deciding this appeal and consolidated the matters. *See* Order, *People v. Arm or Ally, LLC*, No. 24-1497 (June 20, 2024), CA2 ECF No. 41.1.

2

of a federal law violation. Put another way, even if defendants were correct that their products are not firearms, this Court would be required to affirm and permit OAG to proceed on each of its claims based only on defendants' violations of state and local law. In any event, the complaint plausibly alleges that the defendants' products qualify as firearms whose sale violates federal law because their unfinished frames and receivers can be converted into fully operable firearms in minutes with the help of defendants' own guides, templates, and tutorials.

Second, the district court correctly found that PLCAA does not preempt any of the claims in OAG's complaint. The gravamen of OAG's complaint is based on defendants' own misconduct and violations of statutes governing the sale and marketing of unfinished frames and receivers, rather than harm caused by the third-party misuse of a firearm. Therefore, OAG's claims either fall outside the scope of PLCAA or within the ambit of the statute's exceptions to preemption.

Alternatively, this Court should dismiss the appeal for lack of appellate jurisdiction. None of the questions presented by defendants' appeal is controlling or would materially advance the litigation, nor is there a substantial ground for a difference of opinion as to whether the

complaint adequately pleaded that defendants' products are firearms or whether PLCAA preempts OAG's complaint. Accordingly, defendants fail to satisfy the criteria for interlocutory appeal under 28 U.S.C. § 1292(b).

This Court similarly lacks jurisdiction under the collateral-order doctrine. Although defendants mischaracterize PLCAA as an "immunity from suit," no federal court has ever held that a party is entitled to immediate appeal based on the assertion of a PLCAA defense. Moreover, application of PLCAA turns on whether defendants' products are firearms, or component parts thereof, under federal law—a question that is disputed by the parties on both legal and factual grounds. Resolving that dispute is inappropriate on collateral-order review.

## ISSUES PRESENTED

1. Whether the district court correctly denied defendants' motions to dismiss because none of OAG's claims depends on violations of federal law and, in any event, the complaint adequately pleads that the unfinished frames and receivers sold by defendants are firearms under federal law.

2. Whether the district court correctly held that PLCAA does not preempt OAG's claims against entities that sell unfinished frames and receivers into New York State in violation of federal, state, and local law.

3. Whether, in the alternative, this Court should dismiss the appeal for lack of appellate jurisdiction under either 28 U.S.C. § 1292(b) or the collateral-order doctrine.

## STATEMENT OF THE CASE

**A.  Statutory and Regulatory Background**

### 1.  Laws regulating the sale of firearms

Congress enacted the Gun Control Act (GCA) in 1968 following years of concern about "criminals, immature juveniles, and other irresponsible persons [who] were using the relative secrecy of the mail order-common carrier method of obtaining firearms, because they could not purchase guns under the laws in their own jurisdictions."[3] Congress concluded that "widespread traffic in firearms" was a "significant factor in the prevalence of lawlessness and violent crime in the United States" and that the ease with which dangerous persons could acquire firearms through the mail "has materially tended to thwart the effectiveness of State laws and

---

[3] Franklin E. Zimring, *Firearms and Federal Law: The Gun Control Act of 1968*, 4 J. Legal Stud. 133, 145 (1975) (quoting an unpublished report from Sen. Thomas Dodd, the prime sponsor of the GCA).

regulations." GCA, Pub. L. No. 90-351, tit. IV, § 901(a), 82 Stat. 197, 225 (1968). Accordingly, "[t]he twin goals" of the Act's "comprehensive scheme" are to "keep guns out of the hands of criminals and others who should not have them" and "to assist law enforcement authorities in investigating serious crimes." *Abramski v. United States*, 573 U.S. 169, 180 (2014).

To serve these ends, the GCA contains several key features. First, the law broadly defines "'firearm'" to include "any weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive," 18 U.S.C. § 921(a)(3)(A), as well as "the frame or receiver of any such weapon," *id.* § 921(a)(3)(B). Second, the statute requires that any person engaged in the business of making or selling firearms obtain a federal license and prohibits the interstate transfer of weapons to anyone other than a federal licensee. *See generally id.* §§ 922-923. Third, the law requires federal licensees to keep records of the acquisition and transfer of firearms and to conduct a background check before transferring a firearm to a buyer. *See, e.g., id.* § 922(t); *id.* § 923(a), (g)(1)(A). Fourth, the statute prohibits federal licensees from transferring firearms to various categories of individuals, including minors, persons with felony convictions, and persons involuntarily committed to mental

6

institutions. *Id.* § 922(b), (d). Finally, the law requires manufacturers and importers to mark firearms with a serial number. *Id.* § 923(i).

The GCA's definitional, background-check, and purchaser-disqualifier requirements serve "Congress's principal purpose in enacting the statute—to curb crime by keeping firearms out of the hands of those not legally entitled to possess them." *Abramski*, 573 U.S. at 181 (quotation marks omitted). The GCA's recordkeeping and serialization requirements separately further Congress's goal in helping law enforcement investigate crimes committed with firearms by "tracing" the history of purchasers. *See id.* at 182. Over 9,300 law enforcement agencies across the world are enrolled in the federal tracing system, *see* Bureau of Alcohol, Tobacco, Firearms and Explosives, *Five Fast Facts About the National Tracing Center* (Feb. 16, 2023),[4] including every state and local law enforcement agency in New York State, *see* N.Y. Exec. Law § 230(5).

The GCA also reinforces state and local requirements for firearms dealers and buyers, which can often be more stringent than the federal floor. Indeed, one of the principal purposes of the GCA was to ensure

---

[4] For sources available online, URLs are listed in the Table of Authorities. All websites were last checked July 10, 2024.

"that State and local authorities may better exercise the [firearm] controls they deem desirable." H.R. Rep. No. 90-1577, at 12 (1968). As one of the leading Senate sponsors of the GCA explained, "[w]ithout such Federal assistance, any State gun law c[ould] be subverted by any child, fugitive, or felon who orders a gun by mail or buys one in a neighboring State which has lax gun laws." 114 Cong. Rec. 13647 (1968) (statement of Sen. Joseph Tydings).

As relevant here, New York requires firearm dealers to comply with safe storage, recordkeeping, and training requirements, *see, e.g.,* N.Y. Gen. Bus. Law (GBL) §§ 875-e, 875-f, and provides for additional categories of purchaser-disqualification requirements, N.Y. Penal Law § 400.00(1). In addition, New York's gun-related public nuisance statute prohibits gun industry members from engaging in unlawful or unreasonable conduct that "knowingly or recklessly create[s], maintain[s] or contribute[s] to a condition in New York state that endangers the safety or health of the public through the sale, manufacturing, importing or marketing of" firearms or ammunition. GBL § 898-b(1). All "gun industry members who manufacture, market, import or offer for wholesale or retail sale" firearms and ammunition in the state must also "establish

8

and utilize reasonable controls and procedures to prevent [those] products from being possessed, used, marketed or sold unlawfully in New York state." *Id*. § 898-b(2).

In addition to these gun-industry-specific laws, several general state statutes apply to the sale of firearms into New York. For example, GBL §§ 349 and 350 prohibit "deceptive acts or practices" and "false advertising" in "business, trade or commerce." Similarly, general common law doctrines like negligent entrustment are applicable to all persons who possess a dangerous instrument, including firearms dealers. *See Hamilton v. Beretta U.S.A Corp.*, 96 N.Y.2d 222, 237 (2001). Finally, OAG is authorized to file a civil enforcement action to remedy "repeated fraudulent or illegal acts" or "persistent fraud or illegality in the carrying on, conducting or transaction of business." N.Y. Exec. Law § 63(12).

9

## 2. Laws governing products used to make untraceable firearms

In the years since the GCA was enacted, courts have routinely rejected attempts to circumvent the statute's core serialization and background-check requirements. *See, e.g.*, *Huddleston v. United States*, 415 U.S. 814, 820-21 (1974); *Abramski*, 573 U.S. at 181-82. Nevertheless, some companies have sought to exploit perceived loopholes in the law.

As relevant to this case, companies have sold "firearm parts kits, standalone frame or receiver parts, or partially complete frames or receivers to unlicensed persons" without performing background checks on the purchasers or serializing the parts. Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24,652, 24,655 (Apr. 26, 2022). The ready availability of these "unfinished" frame or receiver kits has "enabl[ed] prohibited individuals to easily make firearms at home." *Id.* at 24,655-56. The lack of serialization has, in turn, made it "extremely difficult for law enforcement to determine where, by whom, or when [the firearms] were manufactured, and to whom they were sold or otherwise disposed" when such weapons are recovered from a crime scene. *Id.* at 24,656. The number of untraceable ghost guns recovered from crime scenes has risen exponentially since 2016, *id.*, and law enforce-

10

ment agencies routinely warn that untraceable firearms are particularly likely to be "acquired and used by violent criminals and terrorists." *Id.* at 24,658.

### a. Federal regulations requiring serialization of unfinished frames and receivers

As explained *supra* at 6-7, the GCA's definition of "firearm" encompasses operable and inoperable weapons and the "frame or receiver" of such weapons. 18 U.S.C. § 921(a)(3)(A)-(B); *see United States v. Rivera*, 415 F.3d 284, 286 (2d Cir. 2005). The term "frame" typically refers to the core part of a handgun, while the term "receiver" typically refers to the core part of a rifle or shotgun. *See* 87 Fed. Reg. at 24,654 n.7. Accordingly, the government has long interpreted the term "frame or receiver" to refer to "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." Commerce in Firearms and Ammunition, 33 Fed. Reg. 18,555, 18,558 (Dec. 14, 1968).

The U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) has consistently explained that whether an unfinished frame or receiver is a "firearm" depends on the nature and complexity of the work

11

necessary to turn the product into an operable weapon.[5] For example, in 1978, ATF explained "that an unfinished firearm receiver which may be readily converted to functional condition is a firearm" under the GCA. (Decl. of James M. Thompson ("Thompson Decl."), Ex. A, Letter from Nick Voinovich to Tom Klein (Aug. 2, 1978), S.D.N.Y. ECF No. 206-1.) In 1980, the agency explained that "if an unfinished receiver could be converted to functional condition within a few hours['] time using common hand tools, or simple grinding, cutting, drilling, or welding operations, it would likely qualify as a firearm." (Thompson Decl., Ex. F, Letter from Edward M. Owen to William M. York (June 11, 1980), S.D.N.Y. ECF No. 206-6.) Similarly, the agency concluded in 1994 that "an unfinished, sample AR-15 type receiver" was a firearm because "it may readily be converted to function as the frame or receiver of a firearm" as it is "basically complete, except for a block of metal which is located in the area of the front pivot

---

[5] ATF is tasked with enforcing federal firearms law. The agency has been part of the U.S. Department of Justice since 2003. *See* Pub. L. No. 107-296, § 1111, 116 Stat. 2135, 2274 (2002). Prior iterations of the agency were housed under the U.S. Department of the Treasury and had varying names. *See* Chelsea Parsons & Arkadi Gerney, Ctr. for Am. Progress, *Report: The Bureau and the Bureau* 17-22 (2015). For ease of reference, this brief uses "ATF" to refer to all iterations of the agency with statutory authority to enforce the GCA.

pin and two (2) holes which must be drilled through the receiver walls."
(Thompson Decl., Ex. G, Letter from Edward M. Owen to Thomas C.
Miller (July 14, 1994), S.D.N.Y. ECF No. 206-7.)

By contrast, ATF determined in 2017 that a certain "Glock-type
receiver blank" product would not qualify as a firearm because "critical
machining operations [had] not yet 'implanted'" and the product was "void
of any indicators that designate or provide guidance in the completion of
the firearm." (Mot. to Dismiss Second Amended Compl., Ex. A, Letter
from Michael R. Curtis to Jason Davis (Jan. 18, 2017), S.D.N.Y. ECF No.
175-1.) ATF emphasized that its ruling was limited to the "receiver blank"
product at issue and expressed caution in applying its guidance to other
products. (*Id.*) Likewise, ATF explained in a 2015 interpretive guidance
document that a frame or receiver requiring "substantial additional
machining before it can accommodate fire control components such as a
trigger, hammer, or sear" would likely not be a "firearm," assuming that
licensed gunsmiths performed the machining and serialized the finished
weapon. *See* ATF, Ruling 2015-1 - Manufacturing and Gunsmithing (Jan.
2, 2015).

13

In 2022, following notice and comment, ATF issued a rule updating the regulatory definition of "firearm." First, the rule makes clear that the term "firearm" includes "a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." *See* 27 C.F.R. § 478.11. Second, the rule updates the definition of "frame or receiver" to include a "partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." *Id.* § 478.12(c). Third, the rule defines "readily" to mean "a process, action, or physical state that is fairly or reasonably efficient, quick, and easy" and provides several factors relevant to the classification of a firearm, including time, level of required expertise, expense, and feasibility. *Id.* § 478.11. Similarly, the rule permits consideration of "any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit" in determining whether an "unfinished" part qualifies as a "frame or receiver." *See id.* § 478.12(c).

14

Shortly after the rule took effect, the U.S. District Court for the Northern District of Texas (O'Connor, J.) vacated the rule, disagreeing with ATF's statutory interpretation.[6] *See VanDerStok v. Garland*, 680 F. Supp. 3d 741, 771-72 (N.D. Tex.), *aff'd*, 86 F.4th 179 (5th Cir. 2023). The U.S. Supreme Court granted ATF's application for an emergency stay of the district court's judgment, *Garland v. VanDerStok*, 144 S. Ct. 44 (2023) (mem.), and then granted ATF's petition for a writ of certiorari after the Fifth Circuit affirmed, *see Garland v. VanDerStok*, 144 S. Ct. 1390 (mem.) (2024).

### b. State and local laws prohibiting the sale and possession of unfinished frames and receivers in New York

State and local law prohibits the sale and possession of unfinished frames or receivers in New York independent of any federal law requirements and definitions. Specifically, New York City prohibits any person from selling or possessing "any material . . . that has been shaped or

---

[6] Two other district courts rejected similar challenges to the rule. *See Division 80, LLC v. Garland*, No. 3:22-cv-148, 2022 WL 3648454 (S.D. Tex. Aug. 23, 2022); *Morehouse Enters., LLC v. ATF*, No. 3:22-cv-116, 2022 WL 3597299 (D.N.D. Aug. 23, 2022).

formed in any way for the purpose of becoming the frame or receiver of a firearm, rifle, shotgun or assault weapon with modification by the user and that is not engraved with a serial number." Administrative Code of City of N.Y. § 10-301(22); *see id.* § 10-314 (effective Feb. 23, 2020). Likewise, New York State prohibits the sale and possession of unfinished and unserialized frames and receivers "which may readily be made into a functional frame or receiver through milling, drilling, or other means," with increasing penalties based on the number of such devices sold by a defendant. N.Y. Penal Law §§ 265.00(32), 265.01(10), 265.07, 265.63 to .64 (eff. Apr. 26, 2022). State law separately prohibits the possession and sale of unserialized weapons. *See id.* §§ 265.60 to .61.

The New York City Council and State Legislature enacted these laws in response to a rising use of untraceable firearms in violent crime. For example, the City Council heard testimony from a New York Police Department official explaining that unfinished frame or receiver kits could allow criminal groups to flood communities with hundreds of untraceable weapons. *See* Tr. of Hr'g Before the City Council Comm. on Pub. Safety (June 27, 2019), at 72:4-76:3 (testimony of Oleg Chernyavsky). The sponsor of New York's state law similarly noted that the sale of

16

unfinished frame or receiver kits has "allow[ed] purchasers who have criminal records or others who would not pass a required federal background check to evade those requirements" and reported that "[l]aw enforcement officials in Rochester, Albany, Syracuse, New York City, and other jurisdictions have confirmed that they have either seized ghost guns or have criminal cases pending involving ghost guns." Sponsor Mem. for S. 14A (N.Y. 2021).

### 3. The Protection of Lawful Commerce in Arms Act (PLCAA)

In 2005, Congress enacted the Protection of Lawful Commerce in Arms Act, which prohibits the filing of "qualified civil liability actions" against federal firearms licensees for harms "resulting from the criminal or unlawful misuse of a qualified product by the [plaintiff] or a third party." 15 U.S.C. §§ 7902(a), 7903(5)(A). "[Q]ualified product" is defined, in relevant part, as a "firearm" under 18 U.S.C. § 921(a)(3) or a "component part" thereof. 15 U.S.C. § 7903(4).

PLCAA "does not shield" manufacturers and sellers "if in any way they violate State or Federal law." 151 Cong. Rec. 18086 (2005) (statement of Sen. Larry Craig); *see* 151 Cong. Rec. 17371 (2005) (statement of Sen.

17

Jeff Sessions) (confirming that the gun industry must follow "the State legislature's requirements"). Therefore, the text of PLCAA contains multiple exceptions, whose purpose is "to make the narrow scope of the [PLCAA] clear by listing specific kinds of lawsuits that are not prohibited." 151 Cong. Rec. 18085 (2005) (statement of Sen. Larry Craig).

As relevant here, PLCAA permits suits against gun industry members that have knowingly violated a predicate "State or Federal statute applicable to the sale or marketing of [a qualified] product," where such violations are alleged to be a proximate cause of a plaintiff's injury. 15 U.S.C. § 7903(5)(A)(iii). This "predicate exception" provides several illustrative examples of conduct that might give rise to such a suit, including improper entries into "any record required to be kept under Federal or State law," materially "false or fictitious oral or written statement[s]" as to whether a sale is lawful under federal or state law, and sales to persons who are prohibited from possessing firearms or ammunition under federal law. *Id.* § 7903(5)(A)(iii)(I)-(II). PLCAA also permits suits against sellers based on a "negligent entrustment" theory of tort liability. *See id.* § 7903(5)(A)(ii).

### B. Factual Background

#### 1. Defendants promote and sell unfinished frames and receivers used to make untraceable weapons

Defendants are retailers and distributors of firearms and firearm parts. Each defendant markets and sells unfinished frame or receiver products or kits (Joint Appendix (J.A.) 68, 76, 89, 92, 107, 123, 127, 131, 137), and defendant Rock Slide USA also manufactures such kits (J.A. 137). Seven of the nine defendants possess federal licenses authorizing them to sell and distribute firearms, but defendants KM Tactical and Rock Slide USA lack such licenses and are therefore not legally permitted to "engage in the business of . . . dealing in firearms." 18 U.S.C. § 923(a). (J.A. 59.)

The minimal differences between the "unfinished" and "finished" frames or receivers sold by defendants generally amount to no more than the need to drill a few small holes and mill down a small amount of plastic in the unfinished product. (*See* J.A. 46-48.) Defendants tout the ease with which unfinished frames or receivers can be converted into "finished" parts and used to build fully operable (yet unserialized) weapons. (*See, e.g.*, J.A. 48-49, 69-71, 78-79, 94-95, 108-109.) For example, an instructional video offered by one defendant shows how unfinished frame or

19

receiver kits can be converted into operable weapons with "some basic mechanical aptitude and a few simple tools found in many home workshops." (J.A. 49, 94.)

Defendants further facilitate conversion by shipping the kits in "jigs" and other easy-to-use plastic guides labeled with the simple steps that a customer needs to finish the kit. (*See, e.g.*, J.A. 49-52, 70-71, 90-91, 94.) One defendant, for example, promises that the jigs provided in their kits "make it ridiculously easy for a non-machinist to finish their [receiver kits] in under 1 hour with no drill press required." (J.A. 49, 77.) The same defendant provides a marketing video demonstrating how the receiver kit can be converted into a "military-grade AR-15 lower [receiver], that simply snaps together with the other parts contained in our AR-15 kit" to make "a fully functional" AR-15. (J.A. 53, 79.)

Defendants represent to customers that they do not need to serialize the parts sold in the unfinished kits or the completed weapons themselves and further inform customers that they may have the products shipped directly to their doorsteps without the need to involve a federal licensee or to undergo a background check. (*See, e.g.*, J.A. 69, 76, 108, 137-138.) For example, one defendant represents that an unfinished

frame kit allows a customer to "build a completely legal handgun without any 'government oversight,' aka interference" and touts that its products require "no fuss, no muss, no registration, [and] no records." (J.A. 108.) Another defendant represents that a person wishing to buy a receiver kit need not "purchase from an authorized dealer with a [federal license], undergo a thorough background check, fill out various forms and paperwork, [or] endure a waiting period" because the rifle kit can be "shipped directly to your doorstep." (J.A. 60.)

Notwithstanding state and local prohibitions on the sale and possession of unfinished frames and receivers and federal requirements imposed on sales of firearms (see *supra* at 5-17), defendants routinely represent that their unfinished kits and the resulting untraceable weapons are lawful. (*See, e.g.*, J.A. 77-79, 108-109, 124, 132-133.)

### 2. Defendants sell unfinished frames and receivers into New York without performing background checks or exercising any other controls.

Since 2016, defendants have shipped thousands of unfinished frames and receivers into New York City and State, including after those products were expressly prohibited by state and local law. (J.A. 71, 80, 90, 93, 110-111, 125, 128-129, 135, 137-138.) Indeed, five defendants ship-

21

ped unfinished frames and receivers directly to undercover investigators in New York as recently as May 2022—one month before OAG's enforcement action was filed. (J.A. 66, 69-71, 91, 93, 134, 138.)

Defendants shipped their products into New York without performing any background checks on the purchaser or otherwise taking steps to ensure that the recipient was lawfully authorized to possess firearms in the State. (*See, e.g.*, J.A. 70-71, 80-81, 91, 95, 111-112, 134-135, 138.) Defendants' disregard for verification requirements created a market for untraceable firearms in New York and defendants profited off that market by routinely sending unfinished frame or receiver kits to persons who are not authorized to possess weapons in New York, including felons, domestic abusers, and gun traffickers. (*See, e.g.*, J.A. 71-76, 81-89, 97-107, 112-115, 125-127, 129-131, 134-137.)

## C.   Procedural History

### 1.   The Office of the New York Attorney General (OAG)'s civil enforcement action

In June 2022, OAG initiated this civil enforcement action in state court and moved for a temporary restraining order and preliminary injunction to prevent defendants from continuing to market and sell unfinished frames and receivers into New York. Approximately eight months after removing the case to the U.S. District Court for the Southern District of New York (*see* S.D.N.Y. ECF No. 1), defendants entered a consent order agreeing not to sell, deliver, or otherwise dispose of the prohibited products in New York. (S.D.N.Y. ECF No. 156).

In March 2023, OAG filed the operative complaint, asserting seven causes of action under state law and seeking various forms of monetary and injunctive relief. (J.A. 35-158.) The first cause of action, brought under Executive Law § 63(12), alleges that defendants engaged in repeated or persistent illegality by selling unfinished frames or receivers in violation of local, state, and federal laws. (J.A. 146-149.) The second, fourth, and fifth causes of action, brought under Executive Law § 63(12) and GBL §§ 349 and 350, allege that defendants engaged in fraud or deceptive practices by marketing their products as legal despite various prohibi-

23

tions against the sale of unserialized firearms and unfinished frames and receivers. (J.A. 149-150, 152-153.) The third cause of action alleges that defendants created a public nuisance in violation of GBL § 898-c. (J.A. 150-152.) The sixth and seventh causes of action seek relief under common law theories of negligence per se and negligent entrustment. (J.A. 153-156.)

### 2. The denial of defendants' motions to dismiss

Defendants filed nine separate motions to dismiss. (S.D.N.Y. ECF Nos. 174-191.) In February 2024, the district court (Furman, J.) denied defendants' motions to dismiss in relevant part.[7] (J.A. 159-208.)

First, the court held that the operative complaint adequately alleged that defendants' products were "firearm[s]" within the meaning of the

---

[7] In addition to the rulings described below, the district court rejected defendants' argument that their conduct is protected by the Second Amendment (J.A. 190-194), various claim-specific pleading challenges (J.A. 194-197, 199-200), and a contention that GBL § 898-b is unconstitutionally vague or violates the dormant Commerce Clause (J.A. 200-204). The court also denied defendants' challenge to OAG's theory of joint and several liability at this stage in the case and denied defendants' motion to sever. (J.A. 204-207.) The court did dismiss, as legally insufficient, OAG's negligence per se claim. (J.A. 197-199.) None of these rulings are at issue in this appeal.

24

GCA. (J.A. 170-180.) Specifically, the court found that defendants' products could plausibly be found to be firearms under 18 U.S.C. § 921(a)(3)(A) because they "'will' and are 'designed to' fire projectiles" even if they need additional machination to become operable. (J.A. 171-173.) The court also concluded that defendants' products could also plausibly be found to be "frames or receivers" within the meaning of § 921(a)(3)(B) because they are materially indistinguishable from finished frames or receivers. (J.A. 173-176.) Finally, the court rejected defendants' argument that ATF's pre-2022 interpretation of the GCA would have sanctioned their products, noting that the agency has long considered unfinished parts to be "firearms" when the parts could be made operable with minimal time and effort. (J.A. 179-180.)

Second, the court held that PLCAA does not preempt OAG's claims against any of the defendants. As an initial matter, two of the defendants (KM Tactical and Rock Slide USA) do not possess federal firearms licenses and are therefore categorically excluded from any protections that PLCAA might offer to gun-industry members. (J.A. 182 n.9.) And two of OAG's claims—negligence per se and negligent entrustment—are expressly excluded from PLCAA's reach. (J.A. 181, 189-190.) As to the remaining

25

defendants and claims, the court found that OAG's claims under Executive Law § 63(12) and General Business Law §§ 349 and 350 are not "qualified civil liability action[s]" subject to preemption under PLCAA because they are based on harms caused by defendants' own conduct rather than harms caused by third-party misuse of firearms. (J.A. 182-187.) The court also found that PLCAA's predicate exception applies to OAG's public nuisance claim under General Business Law § 898-c. (J.A. 187-189.)

### 3. Defendants' attempt to obtain interlocutory appellate review

In their notice of appeal from the district court's decision, defendants argued that (i) the denial of the motions to dismiss pursuant to PLCAA is subject to interlocutory review under the collateral-order doctrine, and (ii) the underlying holding that defendants' products are "firearms" within the meaning of federal law is reviewable under "pendent appellate jurisdiction." (J.A. 209.) Defendants also moved the district court to certify the order for interlocutory review pursuant to 28 U.S.C. § 1292(b). (S.D.N.Y. ECF. No. 266-1.)

The district court granted defendants' motion on the ground that the question whether the products are "firearms" is a substantial federal

26

question warranting interlocutory review. The district court warned that "the question is close" and explained that it would not have granted the motion on the question whether PLCAA preempts OAG's complaint. (S.D.N.Y. ECF No. 269 at 4-14.) Defendants then petitioned this Court for leave to file an interlocutory appeal. This Court consolidated the petition with this appeal and referred resolution of the petition to the panel assigned to the earlier filed appeal. *See* Order, *People v. Arm or Ally, LLC*, No. 24-1497 (June 20, 2024), CA2 ECF No. 41.1.

## SUMMARY OF ARGUMENT

I. If this Court decides to grant interlocutory review under § 1292(b), it should affirm the district court's denial of defendants' motions to dismiss. Defendants' challenge to the federal regulatory status of their products, i.e., whether such products are firearms under the GCA, has no bearing on whether any of OAG's state-law claims survive a motion to dismiss. Specifically, none of OAG's claims depends on proof of a federal law violation because OAG alleged violations of state and local law independent of any federal requirements. Therefore, even if defendants were correct that their products do not meet the GCA's defini-

27

tion of a firearm, this Court would be required to affirm the district court's decision in full.

In any event, the complaint plausibly alleges that defendants' products meet the GCA's definition of a "firearm," either because they are weapons "designed" to "expel a projectile by the action of an explosive," or because they may be "readily be converted" to expel a projectile, or because they are sufficiently manufactured to constitute the "frame or receiver" of such a weapon. *See* 18 U.S.C. § 921(a)(3). As the district court noted, the complaint alleged (based on defendants' own marketing statements) that the sole purpose of defendants' products is to produce fully operable firearms with the help of guides, templates, and tutorials provided by the defendants themselves. At a minimum, these allegations are sufficient to survive a pleading challenge.

II. The district court also correctly held that PLCAA does not preempt OAG's civil enforcement action. To constitute a "qualified civil liability action" preempted by PLCAA, a claim must be premised on harms caused by the third-party misuse of a firearm, rather than the defendants' own conduct. 15 U.S.C. § 7903(5)(A). Most of OAG's claims are categorically outside the scope of PLCAA because they are premised

on defendants' own illegal and fraudulent actions in selling and marketing unfinished frames or receivers. And in any event, OAG's claims satisfy PLCAA's exceptions from preemption, including an exception based on a defendants' knowing violation of state and federal law applicable to firearms.

III. Alternatively, this Court should dismiss the appeal for lack of appellate jurisdiction. The questions presented in this appeal do not meet the exacting criteria for interlocutory review under § 1292(b) because immediate appellate review would not materially advance the ultimate termination of this litigation and there is no basis for a substantial difference of opinion as to either of defendants' challenges.

Nor do defendants present a question that qualifies for collateral-order review. No federal court has held that PLCAA affords an immunity from suit akin to absolute or qualified immunity, such that a refusal to dismiss is immediately reviewable as a collateral order. Such a holding would dramatically expand the scope of collateral-order review to include ordinary preemption defenses. Moreover, collateral-order review is not available where, as here, a legal issue turns on disputed facts. In this case, defendants' PLCAA defense is available only if their unfinished

frames or receivers are firearms, or firearm components, within the meaning of federal law. While the OAG has adequately alleged that defendants' products are firearms for purposes of surviving a motion to dismiss the complaint, defendants have consistently maintained their products are not firearms. Resolving that dispute entails consideration of factual issues because regulatory classifications under the GCA are highly fact-dependent and turn on a variety of case-specific factors, including the design and stage of manufacture for a particular product. Such questions cannot properly be resolved on collateral-order review.

## ARGUMENT

### POINT I

#### DEFENDANTS' CHALLENGE TO THE FEDERAL REGULATORY STATUS OF THEIR PRODUCTS IS NOT A BASIS TO DISMISS THE COMPLAINT AND LACKS MERIT IN ANY EVENT

### A. The Regulatory Status of Defendants' Products Is Not Dispositive as to Any of OAG's Claims.

In the decision below, the district court determined that OAG could proceed on six state-law claims—none of which is dependent on a finding that defendants violated federal law. (J.A. 208.) See *supra* at 23-24 (describing OAG's claims under Executive Law § 63(12), GBL §§ 349-350,

898-c, and negligent entrustment). To be sure, OAG can present evidence of alleged federal law violations to support its claims that defendants engaged in repeated illegality, fraud, deceptive business practices, and false advertising, or to argue that defendants created a public nuisance through unlawful conduct. But proof of a federal law violation is not an element of *any* of OAG's causes of action, nor is it in fact the sole basis for any of the causes of action in this case.

For example, Executive Law § 63(12) prohibits repeated or persistent illegality in the conduct of business and provides a mechanism for OAG to seek remedies for violations of federal, state, or local law. *See State v. Cortelle Corp.*, 38 N.Y.2d 83, 85 (1975); *Matter of People v. Ivybrooke Equity Enters., LLC*, 175 A.D.3d 1000, 1001 (4th Dep't 2019). And General Business Law § 898-b(1) prohibits gun industry members from maintaining or contributing to a public nuisance through "unlawful" conduct. In addition to alleging federal law violations, the complaint alleges that defendants shipped thousands of unfinished frames or receivers into the State after the New York City Council and State Legislature enacted laws unambiguously prohibiting the sale and possession of such products. (J.A. 71, 80, 90, 93, 110-111, 125, 128-129, 135,

137-138.) OAG can therefore prove its Executive Law § 63(12) "illegality" and gun-related public nuisance claims solely by reference to defendants' violations of state and local laws.

Similarly, OAG can prove its Executive Law § 63(12) "fraud" claim and its deceptive business practices and false advertising claims under GBL §§ 349-350 solely by reference to violations of state and local law, as defendants' representations about the "lawfulness" of their products are misleading in violation of these distinct nonfederal prohibitions. Finally, several of OAG's claims do not require evidence of underlying statutory violations at all. *See, e.g.*, GBL § 898-b(2) (creating liability for having a lack of reasonable controls); *Hamilton*, 96 N.Y.2d at 237 ("The tort of negligent entrustment is based on the degree of knowledge the supplier of a chattel has or should have concerning the entrustee's propensity to use the chattel in an improper or dangerous fashion.")

Accordingly, defendants are simply wrong to argue that "[m]ost of the State's case rises or falls" on the federal regulatory classification of their products. Br. for Defs.-Appellants (Br.) at 23. To the contrary, the classification has a much greater effect on *defendants'* litigation position, as defendants acknowledge that their PLCAA-preemption defense

32

depends on a finding that their products are firearms (or firearm components) under federal law. *Id.* at 21.

In other words, even if defendants were correct that their products are *not* firearms under federal law, this Court would be required to affirm the district court's denial of the motions to dismiss in full. While a ruling on this issue might affect the evidence OAG presents at trial or the remedies it could seek after a liability finding, there is no basis for this Court to issue an improper "advisory opinion" on these issues. *See Ashcroft v. Mattis*, 431 U.S. 171, 172 (1977) (per curiam); *Jennifer Matthew Nursing & Rehab. Ctr. v. U.S. Department of Health & Hum. Servs.*, 607 F.3d 951, 957 (2d Cir. 2010).

## B. The Complaint Adequately Alleges That Defendants' Products Are Firearms Under Federal Law.

If this Court reaches the question of whether defendants' products are firearms under federal law, it should affirm the district court's decision on the merits.

As explained above (at 6), the GCA defines "firearm," in relevant part, as "(A) any weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive" or "(B) the

33

frame or receiver of any such weapon." 18 U.S.C. § 921(a)(3). Congress wrote the provision in the disjunctive to ensure that the GCA would apply broadly to weapons that "will" fire a bullet as well as products that are "designed" or "readily" made to do so and the key components of such weapons. *See United States v. Simels*, 654 F.3d 161, 171 (2d Cir. 2011). The allegations in the complaint are sufficient to plead that defendants' products satisfy both subsection (A) and subsection (B) of the federal definition.

### 1. The complaint alleges that defendants' products are "designed" or "may readily be converted" to expel a projectile, within the meaning of 18 U.S.C. § 921(a)(3)(A).

As the district court concluded (J.A. 170-173), the complaint adequately alleges that the unfinished frame or receiver kits sold by defendants are "designed" to expel a projectile or can "readily be converted" to do so, and therefore meet the definition of "firearm" set forth in § 921(a)(3)(A).

A weapon is "designed" to expel a projectile if it is "originally designed to fire a bullet," regardless of whether it is currently in a condition to do so. *Rivera*, 415 F.3d at 286. Other appellate courts have

34

likewise held that a weapon satisfies the "design" prong of the "firearm" definition even if it is so significantly damaged that it cannot currently fire, *id.*, is missing significant parts, *United States v. Hardin*, 889 F.3d 945, 948 (8th Cir. 2018), has been disassembled into a "mere collection of parts," *United States v. Drasen*, 845 F.2d 731, 736 (7th Cir. 1988), or requires "an hour or two" of expert gun repair to make it fire. *United States v. Dotson*, 712 F.3d 369, 370 (7th Cir. 2013).

Courts have held that a product "may be readily converted" to expel a projectile when it can be altered into an operable firearm in a short period of time with the assistance of tools. *United States v. 16,179 Molso Italian .22 Caliber Winlee Derringer Convertible Starter Guns*, 443 F.2d 463, 465 (2d Cir. 1971) (twelve minutes or less); *United States v. Mullins*, 446 F.3d 750, 756 (8th Cir. 2006) (less than an hour by nonexpert). These decisions are consistent with the dictionary definitions of the terms "readily" and "convert" contemporaneous with the passage of the GCA. For example, a contemporaneous definition for "readily" defined the term as "with fairly quick efficiency," "without needless loss of time," "reasonably fast," and "with a fair degree of ease." *Webster's Third New International Dictionary of the English Language Unabridged* 1889 (1968). The

same dictionary defined "convert" as "to change or turn from one state to another: alter in form, substance or quality." *Id.* at 499.

OAG's complaint alleges in relevant part that defendants' products are "designed" solely for the purpose of creating firearms that are functionally and visually indistinguishable from popular weapons platforms, such as the frames of Glock pistols, or the receivers of AR-9, AR-15, or AK-47 rifles. (J.A. 43, 45, 53.) For example, as instructed in a marketing video, a purchaser of defendants' products can snap the unfinished receiver "into an easy jig, and drill[s] into the areas the template guides you through" so that the part "simply snaps together with the other parts contained in our AR-15 kit." (J.A. 52-53.) As one customer described, defendants' products and tutorials made it "EASY AS CAN BE" to produce a working firearm without any "prior gunsmithing knowledge." (J.A. 49.)

OAG also alleges that defendants' unfinished frames and receivers "can be converted into . . . working gun[s] in under thirty minutes" by someone with prior experience, and in under an hour by an amateur. (J.A. 45.) Defendants themselves have advertised their unfinished frames and receivers as "ridiculously easy for a non-machinist to finish . . . in under 1 hour with no drill press required" (J.A. 49), "[i]n the comfort and

36

privacy of [one's] home," (J.A. 70). Indeed, unfinished frames and receivers are commonly called "80% lowers" because "about 80 percent of the work is already done for you." (J.A. 53.) These allegations more than plausibly establish that defendants' unfinished frames and receivers are "firearm[s]" under § 921(a)(3)(A).

### 2. The complaint alleges that defendants' products are "the frame or receiver" of a weapon within the meaning of 18 U.S.C. § 921(a)(3)(B).

The district court also correctly concluded (J.A. 174-176), that the complaint adequately alleges that the unfinished frames and receivers sold by defendants are "the frame or receiver" of a weapon, as provided in § 921(a)(3)(B).

The complaint explains that the differences between defendants' "unfinished" and "finished" versions of frames and receivers are negligible. (J.A. 46.) For example, OAG alleges that defendants' products are "virtually identical" to finished frames or receivers because, in the case of a typical pistol frame, the requisite finishing "amount[s] to having to drill three small holes and milling down a small amount of plastic at the top of the frame." (J.A. 46.) OAG further alleges that defendants' "unfinished" products are fully compatible with—and "designed to mimic" the

frames or receivers for—guns like the Glock Third Generation G19 or G23, or AR-9, AR-15, or AK-47 rifles. (J.A. 43-44.) Although defendants contend that their products are not sufficiently manufactured to constitute a "finished" frame or receiver (*see* Br. at 30), that fact-based argument cannot be the basis to prevail on a motion to dismiss.

### 3. Defendants' arguments to the contrary are meritless.

None of the arguments raised by defendants to challenge the district court's holding have merit.

First, defendants erroneously assert that § 921(a)(3)(A) "has no relevance" here because their products are "frames or receivers," and subsection (B) is the only provision that may apply to such products. Br. at 28. As the district court explained (J.A. 173), this argument is self-defeating because it presumes that unfinished frames and receivers would qualify as firearms under subsection (B). The district court also correctly found (J.A. 173-175) that defendants' argument is premised on the false assumption that § 921(a)(3)'s subsections are mutually exclusive. "Indeed, it is not hard to imagine objects that satisfy two or more of the . . . subsections in § 921(a)(3)." (J.A. 174.) For example, an object would satisfy multiple subsections of the definition if it were designed to fire

bullets *and* had a frame and receiver. *VanDerStok*, 86 F.4th at 210 (Oldham, J., concurring).

Second, defendants cite to the Fifth Circuit's opinion in *VanDerStok* and stray comments in briefs submitted by ATF in prior litigation in support of the proposition that Congress did not intend for subsection (B) to include products, like theirs, that were "designed to [be] or may be readily converted" into frames or receivers because that language applies only to weapons described in subsection (A). 86 F.4th at 189; *see* Br. at 24-28. Defendants' reading of the statute ignores the plain text. Subsection (B) does not omit the relevant language—instead, by including the phrase "any such weapon," Congress specifically incorporated subsection (A)'s definition by reference, including its reference to inoperable products that are "designed to" or "may readily be converted" into a weapon. *See* 86 F.4th at 210 (Oldham, J., concurring) (quotation marks omitted). Defendants' statutory reading would also undermine the purposes of the GCA because it would allow persons to evade critical requirements merely by selling operable weapons in parts. That result is inconsistent with decades of case law in this Court and elsewhere declining to draw a

39

distinction between operable and inoperable weapons in determining the meaning of a firearm under § 921(a)(3). See *supra* at 34-36.

Third, defendants cite to competing dictionary definitions to argue that their products are not "weapons" or "readily" convertible. Br. at 29-31. For example, defendants contend that "converting an unfinished frame into something that will expel a projectile requires additional parts, specialized tools to drill holes and mill parts, the knowledge of how to perform those precise actions, and time to complete the necessary steps." *Id.* at 30. At most, these arguments amount to a disagreement with the factual allegations of the complaint and the inferences that can permissibly be drawn from such allegations.[8] These arguments offer no basis to reverse the district court's ruling.

Finally, defendants insist that, prior to ATF's 2022 rule, the agency considered unfinished frames and receivers to fall outside the definition

---

[8] Defendants similarly assert that their products are just "hunk[s] of plastic or metal incapable of any explosion" or mere interchangeable parts akin to "springs" or "screws." Br. at 29-30. These statements are merely disagreements with the factual allegations of the complaint and cannot be considered on a motion to dismiss. Moreover, defendants' representations in their brief are implausible given their own statements promoting their products as a simple means to produce unserialized firearms with minimal effort and tools. See *supra* at 19-21.

of a "firearm." Br. at 31-32. But as explained above (at 11-15), the agency has long taken the position that unfinished frames and receivers are "firearms" if they can be readily converted to fire in a relatively short period of time and it continues to defend that position today. *See* Br. for Pet'rs at 2, 5-6, 9-10, *Garland v. VanDerStok* (June 25, 2024), No. 23-852; 87 Fed. Reg. at 24,652-734. Agency "interpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning." *Loper Bright Enters., Inc. v. Raimondo*, No. 22-451, 2024 WL 3208360, at *13 (U.S. June 28, 2024).

To be sure, defendants cite to ATF documents in which the agency opined, based on specific facts and circumstances, that certain products were not sufficiently manufactured to constitute firearms. *See* Br. at 31-32. For example, defendants quote from a 2015 ATF interpretative ruling, claiming that specific products that require only "minor drilling and machining activities" are not "firearm frames or receivers." Br. at 31. But the next two sentences in that ruling correctly state that a frame or receiver "may be sufficiently complete to be classified and regulated as a 'firearm'" even if it "requires substantial additional machining before it

41

can accommodate fire control components such as a trigger, hammer, or sear and be used to expel projectiles." ATF, Ruling 2015-1 – Manufacturing and Gunsmithing at 1-2 (Jan. 2, 2015). Defendants are likewise mistaken to argue that ATF determined in a 2017 letter that unfinished frames are "not . . . firearms." Br. at 32. In fact, the 2017 letter concluded that a single frame model was not a firearm because, for example, the product was "void of any indicators that designate or provide guidance in the completion of the firearm." (S.D.N.Y. ECF No. 175-1.)

The 2015 ruling and 2017 letter are therefore properly considered to be part of a long history of ATF's fact-specific approach to classification.[9] See *supra* at 11-15. Moreover, the facts underlying the conclusions reached in those documents differ dramatically from those presented

_____

[9] The remaining materials cited by defendants likewise demonstrate the agency's fact-specific regulatory approach. For example, the ATF webpage cited by defendants (Br. at 32) provides that a "partially machined" receiver "meet[s] the GCA definition of a firearm." ATF, *Are "80%" or "unfinished" receivers illegal?* (Apr. 6, 2020). Defendants also cite to a 2021 memorandum of law submitted by ATF in litigation relating to ghost guns (Br. at 32), but that memorandum of law reiterates the agency's position that substantially completed frames and receivers are firearms. Mem. of Law in Supp. of Defs.' Mot. for Summ. J. at 30-34, *City of Syracuse v. ATF* (S.D.N.Y. Mar. 19, 2021), (No. 20-cv-6885), ECF No. 98.

here. For example, defendants here tout their products as requiring minimal additional machining, ship their products in "jigs" designed to give the consumer directions on how to "finish" the frame or receiver, and guide the consumer's handiwork to eliminate mistakes, including by providing detailed instructions via YouTube and a telephone help line to walk consumers through finishing their ghost guns. (J.A. 48-53, 94, 108.) Defendants cite to no ATF document that has ever sanctioned such conduct and their products plainly constitute firearms under ATF's current rule. *See* 27 C.F.R. § 478.11 (defining "firearm" to include "a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive"); *see id.* § 478.12(c) (defining "frame or receiver" to include a "partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver.").

## POINT II

### PLCAA DOES NOT PREEMPT OAG'S CIVIL ENFORCEMENT ACTION

This Court should also affirm the district court's holding (J.A. 180-190) that PLCAA does not preempt OAG's action. At the outset, defendants concede that KM Tactical and Rock Slide USA are not licensed to sell firearms and therefore are not entitled to assert a PLCAA-preemption defense. Br. at 21. And defendants do not contest the district court's conclusion (J.A. 189-190) that OAG's negligent entrustment claim is exempt from preemption under PLCAA. Accordingly, defendants' PLCAA argument on appeal is limited to OAG's statutory claims asserted under Executive Law § 63(12), GBL §§ 349, 350, and 898-c against seven defendants.

As explained in more detail below, PLCAA does not preempt OAG's statutory claims. In our federal system, the "States have broad authority to enact legislation for the public good." *Bond v. United States*, 572 U.S. 844, 854 (2014). "[B]ecause the States are independent sovereigns in our federal system," courts must presume that Congress has intended to preserve state law—a presumption that is overcome only where Congress demonstrates a "clear and manifest" preemptive purpose. *Medtronic, Inc.*

44

*v. Lohr*, 518 U.S. 470, 485 (1996) (quotation marks omitted). Here, PLCAA's plain text shows that Congress had no intention to preempt suits which, like OAG's civil enforcement action, are based on a gun industry member's own violation of federal and state laws rather than on a third-party purchaser's misuse of lawfully-sold firearms.

### A. OAG's Statutory Claims Are Not "Qualified Civil Liability Actions" Within the Meaning of PLCAA.

PLCAA's plain text preempts only those claims against firearm sellers and manufacturers that meet the statutory definition of "qualified civil liability action," i.e., claims seeking "damages . . . or other relief, resulting from the criminal or unlawful misuse of a [firearm] by the [plaintiff] or a third party" and that do not fall within one of PCLAA's enumerated exceptions. 15 U.S.C. § 7903(5)(A); *see Ileto v. Glock, Inc.*, 565 F.3d 1126, 1131-32 (9th Cir. 2009). PLCAA's legislative history confirms that Congress did not intend to "prevent [gun manufacturers and sellers] from being sued for their own misconduct" but rather to preempt "one extremely narrow category of lawsuits[:] lawsuits that attempt to force the gun industry to pay for the crimes of third parties over whom they have no control." 151 Cong. Rec. 18084 (2005) (statement of Sen.

Craig); *see also* 151 Cong. Rec. 17371 (2005) (statement of Sen. Sessions) ("Manufacturers and sellers are still responsible for their own negligent or criminal conduct . . . ."); 151 Cong. Rec. 18920 (2005) (statement of Sen. Lindsey Graham) (the legislative intent is to prohibit suits that seek "under a gross negligence or simple negligence standard [to] create a duty on the part of sellers and manufacturers for an event that they can't control, which is the intentional misuse of a weapon to commit a crime . . . .").

The district court therefore correctly concluded that PLCAA is not available as a defense when a claim is premised on a defendants' own illegal conduct, rather than the misuse of a weapon by others. (J.A. 182-183.) Applying this standard, the district court found that defendants cannot assert PLCAA as a defense against OAG's Executive Law § 63(12) claims or its claims under GBL §§ 349 and 350 because those claims do not seek redress for harms resulting from third-party misuse of a firearm but rather are premised on defendants' own repeated and persistent violations of federal, state, and local law, fraudulent acts, deceptive business practices, and false advertising. (J.A. 182-183.) OAG's public nuisance claim is likewise based on defendants' own unlawful and unreasonable conduct and lack of reasonable controls. (J.A. 150-152.) Such

claims do not seek to impose "vicarious liability for harm caused by firearms that were lawfully distributed into primary markets," *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 403 (2d Cir. 2008), and, therefore, fall outside the scope of PLCAA.

## B. Alternatively, OAG's Statutory Claims Can Proceed Under PLCAA's Predicate Exception.

In any event, even if OAG's statutory causes of action could be construed as "qualified civil liability actions," they each satisfy PLCAA's predicate exception, which exempts from preemption any "action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the [qualified] product, and the violation was a proximate cause of the harm for which relief is sought." 15 U.S.C. § 7903(5)(A)(iii).

### 1. OAG's claims are based on violations of statutes applicable to the sale or marketing of firearms.

The first requirement of the predicate exception is to identify a violation of "a State or Federal statute applicable to the sale or marketing" of a firearm. *Id.* The phrase "applicable to" identifies the object of regulation—here, the gun industry's sale and marketing of firearms.

*Beretta*, 524 F.3d at 402; *see also Applicable*, *Black's Law Dictionary* (12th ed. 2024) ("affecting or relating to a *particular person, group, or situation*" (emphasis added)) (Westlaw). Accordingly, this Court in *Beretta* interpreted the words "statute applicable to the sale or marketing" of qualified products to include statutes that "expressly regulate firearms" or "clearly can be said to implicate the purchase and sale of firearms," or otherwise have been interpreted by a court to apply to the sale and marketing of firearms. 524 F.3d at 404. Here, each of the five statutory claims challenged by defendants involves an underlying violation of a qualifying predicate statute.

First, OAG's Executive Law § 63(12) "illegality" claim provides the vehicle by which OAG can hold defendants liable for violating state and federal laws that expressly regulate firearms, such as the GCA and state-law prohibitions on the sale of unfinished frames and receivers. See *supra* at 15-17, 30-33. Contrary to defendants' argument (Br. at 46-47), nothing in the text of the predicate exception or this Court's decision in *Beretta* requires that a plaintiff seek relief under the statute that was violated. Indeed, such a requirement would undermine the purposes of the predicate exception because private plaintiffs often lack the ability to

48

directly enforce federal and state criminal laws regulating the sale of firearms.

Second, OAG's Executive Law § 63(12) "fraud" claim as well as the deceptive trade practices and false advertising claims brought under GBL §§ 349 and 350 satisfy the predicate exception because such statutes are among the "state consumer protection laws" contemplated by Congress in enacting PLCAA and its predicate exception. *See Soto v. Bushmaster Firearms Int'l, LLC*, 331 Conn. 53, 121-22, 124-25 (2019), *cert. denied*, *Remington Arms Co., LLC v. Soto*, 140 S. Ct. 513 (2019).

Defendants are simply wrong to argue that "statutes of general applicability" are not sufficient to serve as predicates for purposes of PLCAA. As this Court explained in *Beretta*, the predicate exception encompasses laws of general applicability that can "clearly can be said to implicate the purchase and sale of firearms," or otherwise have been interpreted by a court to apply to the sale and marketing of firearms. 524 F.3d at 404. And as the Connecticut Supreme Court explained in *Soto*, "[r]eading the predicate exception to encompass actions brought to remedy illegal and unscrupulous marketing practices under state consumer protection laws is consistent with" *Beretta*, because unfair and deceptive

49

business practices statutes have previously been applied to gun sales and marketing.[10] 331 Conn. at 124-25.

Finally, OAG's public nuisance claim is covered by PLCAA's predicate exception because New York's firearm-specific nuisance law, GBL §§ 898-a to -e, is a "statute[] that actually regulate[s] the firearms industry," *Beretta*, 524 F.3d at 404. Defendants are mistaken to argue (Br. at 48-49) that this firearm-specific statute is merely a codified nuisance tort providing a "general tort theor[y]" of liability, *cf. Ileto*, 565 F.3d at 1136.

To the contrary, the statute applies only to "gun industry member[s]" and forbids such persons from creating, maintaining, or contributing to a condition that endangers public health or safety in New York through unlawful and unreasonable conduct in the sale or marketing of firearms. GBL § 898-b(1). The statute further requires gun industry members to "establish and utilize reasonable controls and procedures" to prevent their products "from being possessed, used, marketed or sold unlawfully

---

[10] The district court was therefore also incorrect to observe, in dicta, that GBL §§ 349 and 350 are unlikely to "qualify under the predicate exception." (J.A. 184.)

in New York state." *Id.* § 898-b(2). The bill introducer's memorandum confirms that the basic purpose of the statute is to regulate "the sale or marketing of firearms." Senate Introducer's Mem., *in* Bill Jacket for ch. 237 (2021). The statute therefore indisputably "imposes liability exclusively on gun manufactur[ers] for the manner in which guns are manufactured, marketed, and sold." *National Shooting Sports Found., Inc. v. James*, 604 F. Supp. 3d 48, 59 (N.D.N.Y. 2022), *appeal argued,* No. 22-1374 (2d Cir. Nov. 3, 2023).

### 2. The complaint alleges that defendants knowingly violated the law and that their violations were the proximate cause of the identified harms.

A claim will satisfy the predicate exception if it is based on allegations that a defendant "knowingly violated" a state or federal statute and that the violation was the "proximate cause" of the harm suffered by the plaintiff. 15 U.S.C. § 7903(5)(A)(iii). The phrase "knowingly violate[d]" requires "knowledge of facts and attendant circumstances that comprise a violation of the statute, not specific knowledge that one's conduct is illegal." *United States v. Weintraub*, 273 F.3d 139, 147 (2d Cir. 2001); *see Dixon v. United States*, 548 U.S. 1, 5 (2006). The proximate cause requirement, in turn, mandates a showing that the identified harms "have a

reasonable connection to [the defendant's] actions." *Laborers Loc. 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 235 (2d Cir. 1999). The district court correctly held (J.A. 184-187) that OAG's complaint adequately pleaded both elements.

With respect to mens rea, OAG alleges, among other things, that defendants marketed and sold unfinished frames and receivers to individuals who are ineligible to legally possess a firearm by representing that their products could be purchased without a license or the need to undergo background checks. (J.A. 44, 71, 76, 83-84, 88-89, 97-98, 107-108, 111-116, 127, 131, 136-138.) These allegations are more than sufficient to establish a "knowing" violation under this Court's case law. *See, e.g.*, *Weintraub*, 273 F.3d at 147; *see also United States v. Sicignano*, 78 F.3d 69, 71-72 (2d Cir. 1996) (holding that "knowledge" can be based on "awareness" of relevant facts).

Defendants' argument to the contrary (Br. at 50-52) is premised on a misreading of the Supreme Court's decision in *Rehaif v. United States*, 588 U.S. 225 (2019), which held that, in prosecutions under 18 U.S.C. § 922(g) for possession of a firearm by an individual subject to a statutory disqualifier (e.g., a felon), the government must prove that "the defendant

52

knew he possessed a firearm and also that he knew he had the relevant status when he possessed it." 588 U.S. at 227; *see id.* at 234. *Rehaif* did not hold, as defendants suggest (Br. at 50), that the government must prove in all cases that a defendant knew about the specific law that was allegedly violated. And the other cases cited by defendants (*id.*) are similarly inapposite because, unlike here, they involved statutes that required specific knowledge that the conduct at issue was "unauthorized" by statute or regulation. *Ruan v. United States*, 597 U.S. 450, 454 (2022); *Liparota v. United States*, 471 U.S. 419, 433-34 (1985).

With respect to causation, OAG alleges that defendants sold nearly completed firearms parts directly to consumers without performing background checks or taking any other steps to verify the legal ability of their purchasers to possess firearms. (J.A. 71, 80-81, 91, 95, 111-112, 138.) The complaint also alleges that defendants created a market for untraceable guns and routinely sent unfinished frame or receiver kits to, among others, felons, domestic abusers, and gun traffickers. (J.A. 71-76, 81-89, 97-107, 112-115, 125-127, 129-131, 134-137.) And the complaint alleges that defendants' illegal conduct foreseeably led to an increase in the number of firearms in bad actors' hands, undermined gun safety measures

enacted by Congress, the New York State Legislature, and the New York City Council, increased the number of murders and suicides, and placed victims of intimate partner violence at greater risk. (J.A. 139-146.)

Contrary to defendants' argument (Br. at 52-58), third-party use of their products has not broken the causal chain between defendants' actions and the harms identified above. As the district court correctly observed, "the relevant question is whether the harm was a foreseeable and direct consequence of the alleged [statutory] violations." (J.A. 186 (quotation marks omitted)). Assuming the truth of the allegations in the complaint, a factfinder could readily conclude "that [defendants] should have known there was a high likelihood that the firearms would end [up] with wrongdoers who were highly likely to injure others." *Minnesota v. Fleet Farm LLC*, No. 22-cv-2694, 2023 WL 4203088, at *12 (D. Minn. June 27, 2023)*; see Estados Unidos Mexicanos v. Smith & Wesson Brands, Inc.*, 91 F.4th 511, 536 (1st Cir. 2024). Defendants' quibbles about the inferences that can be drawn from the complaint's allegations are not sufficient to sustain a motion to dismiss.

## POINT III

### IN THE ALTERNATIVE, THIS COURT SHOULD DISMISS THE APPEALS FOR LACK OF APPELLATE JURISDICTION

This Court should, in the alternative, dismiss the petition for lack of appellate jurisdiction. The appeal does not meet the stringent criteria for interlocutory appellate review under 28 U.S.C. § 1292(b), for the reasons fully explained in OAG's opposition to defendants' petition for leave to file an appeal and addressed briefly below.[11] *See* Mem. in Opp'n Pet. for Lv. to Appeal at 15-24, *People of the State of N.Y. v. Arm or Ally, LLC*, No. 24-1497 (June 11, 2024), ECF No. 32. And this Court does not have jurisdiction over this appeal under the collateral-order doctrine or pendent appellate jurisdiction.

### A. Defendants' Petition for Interlocutory Appeal Under 28 U.S.C. § 1292(b) Should Be Denied.

Certification of an interlocutory appeal under 28 U.S.C. § 1292(b) is a narrow exception to the stringent finality rules applicable in federal courts and is "limited to extraordinary cases" where interlocutory appel-

---

[11] This Court has discretion to deny a petition for interlocutory appeal even where the district court has granted a motion for certification. *See* 28 U.S.C. § 1292(b); *Petersen Energía Inversora S.A.U. v. Argentine Republic & YPF S.A.*, 895 F.3d 194, 212 (2d Cir. 2018).

late review "might avoid protracted and expensive litigation." *German ex rel. German v. Federal Home Loan Mortg. Corp.*, 896 F. Supp. 1385, 1398 (S.D.N.Y. 1995). Accordingly, certification requires "a controlling question of law as to which there is substantial ground for difference of opinion" and a finding that an immediate appeal "may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). None of these standards are met here.

First, the question of whether the unfinished frames and receivers sold by defendants are firearms under federal law is not "controlling" or likely to "materially advance" the litigation because OAG's claims can be proven entirely by defendants' independent violations of state and local laws. See *supra* at 30-33. While "the resolution of an issue need not necessarily terminate an action in order to be 'controlling,'" *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 921 F.2d 21, 24 (2d Cir. 1990), it must at a minimum, "significantly affect the conduct of the action" or have "precedential value for a large number of cases," *In re A2P SMS Antitrust Litig.*, No. 12-cv-2656, 2015 WL 876456, at *3 (S.D.N.Y. Mar. 2, 2015) (quotation marks omitted).

56

Here, there is no question that the action will proceed on every claim no matter how this Court resolves the question of whether the complaint adequately pleads that defendants' products are firearms. And it is unlikely that an interlocutory appeal here would have broader precedential value, given that the Supreme Court already granted certiorari on this question in *Garland v. VanDerStok* to be resolved in the next term. *See Doe v. Karadzic*, No. 93-cv-878, 1999 WL 6360, at *4 (S.D.N.Y. Jan. 7, 1999) ("It would be imprudent to certify an issue for interlocutory appeal that will be resolved by the Supreme Court during the present Term.").

Second, defendants' PLCAA-preemption challenge is likewise not "controlling" because PLCAA has no bearing on *any* of OAG's claims against two of the defendants (KM Tactical and Rock Slide USA), and expressly permits OAG's negligent entrustment claim. *See* 15 U.S.C. § 7903(5)(A)(ii). See *supra* at 18. Accordingly, OAG would proceed on all of its claims against two defendants and on at least one claim against all nine defendants regardless of whether defendants ultimately prevail on their PLCAA arguments.

57

Third, there is no substantial ground for a difference of opinion as to either of defendants' challenges. To find a substantial ground for a difference of opinion, "there must be 'substantial doubt' that the district court's order was correct." *Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Ams.*, 426 F. Supp. 2d 125, 129 (S.D.N.Y. 1995). As the district court correctly observed (S.D.N.Y. ECF No. 269 at 8), there is no meaningful conflicting authority on the question of whether defendants' products are firearms under federal law, notwithstanding the Fifth Circuit's decision in *VanDerStok* and the Supreme Court's subsequent grant of certiorari. The Fifth Circuit's decision never had any legal effect because the Supreme Court stayed the underlying district court order shortly after it was issued and again after the district court attempted to narrow its terms. *See Garland v. VanDerStok*, 144 S. Ct. at 44; *Garland v. Blackhawk Mfg. Grp., Inc.*, 144 S. Ct. 338 (2023) (mem.). Accordingly, the grant of certiorari could reasonably reflect the Supreme Court's conclusion that it

needed to correct an outlier appellate decision on an issue of national significance.[12]

The district court also correctly found that there is no substantial difference of opinion as to whether PLCAA bars actions that are based on a gun industry members' own misconduct rather than the misconduct of others. (*See* S.D.N.Y. ECF No. 269 at 14.) That conclusion follows directly from the text of the statute, as well as this Court's holding in *Beretta*. Defendants' personal disagreement with the district court's application of settled law does not demonstrate a substantial difference of opinion.

## B.    This Court Lacks Jurisdiction over Defendants' Noticed Appeal.

Defendants are also wrong to argue (Br. at 14-20) that this Court has jurisdiction over their interlocutory appeal under the collateral-order doctrine. The collateral-order doctrine "carve[s] out a narrow exception to the normal application of the final judgment rule." *Midland Asphalt*

---

[12] *See, e.g.*, *Murthy v. Missouri*, No. 23-411, 2024 WL 3165801 (U.S. June 26, 2024); *United States v. Rahimi*, No. 22-915, 2024 WL 3074728 (U.S. June 21, 2024); *Food & Drug Admin. v. Alliance for Hippocratic Med.*, 602 U.S. 367 (2024); *Consumer Fin. Prot. Bureau v. Community Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416 (2024); *United States v. Texas*, 599 U.S. 670 (2023).

*Corp. v. United States*, 489 U.S. 794, 798 (1989). A collateral order must (i) "conclusively determine the disputed question," (ii) "resolve an important issue completely separate from the merits of the action," and (iii) "be effectively unreviewable on appeal from a final judgment." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978). These conditions are "stringent," and must be kept so otherwise the doctrine "will overpower the substantial finality interests § 1291 is meant to further." *Will v. Hallock*, 546 U.S. 345, 349-50 (2006) (quotation marks omitted).

In the nearly two decades since PLCAA's enactment, no federal court has ruled that an order denying a motion to dismiss under PLCAA is immediately appealable under the collateral-order doctrine.[13] This

---

[13] The Texas Supreme Court held, in a case involving state-court mandamus procedures, that PLCAA confers a right on covered defendants not to proceed to trial. *In re Academy, Ltd.*, 625 S.W.3d 19, 34 (Tex. 2021). This holding has no bearing on the jurisdictional question presented to this Court because state-court decisions are of little persuasive value when their appellate procedures "reflect policy choices quite different from the limited collateral appeals permitted in federal court," *In re World Trade Ctr. Disaster Site Litig.*, 521 F.3d 169, 182 (2d Cir. 2008). Indeed, it is well settled that Texas's mandamus doctrine permits review in circumstances where an immediate appeal would not be available under the collateral-order doctrine. *Compare Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863 (1994)876-77 (rejecting collateral-order review for asserted contractual right "not to stand trial") *with In re*
(continued on the next page)

Court should decline defendants' invitation to expand the doctrine to permit interlocutory review of an ordinary preemption defense.

First, the district court's denial of defendants' PLCAA defense at the pleading stage does not "conclusively determine the disputed question" and is not "separate from the merits" because the question is necessarily "enmeshed in the factual and legal issues comprising [OAG's] cause of action," *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 33 n.4 (2d Cir. 2006), i.e., whether defendants were required to comply with, for example, federal serialization requirements, because their unfinished frames or receivers were "firearm[s]," or "component part[s]" thereof, within the meaning of the GCA and PLCAA, 18 U.S.C. § 921(a)(3); 15 U.S.C. § 7903(4).

As defendants concede (Br. at 20-21), PLCAA is relevant to this case only if defendants' products are firearms (or components thereof) under federal law—a position that defendants themselves strongly contest (Br. at 22-35). The question of whether defendants' products are firearms or firearm components is fact-specific (see *supra* at 37-43) and the only

---

*McAllen Med. Ctr., Inc.*, 275 S.W.3d 458, 465 (Tex. 2008) (listing examples of appropriate mandamus review).

61

decision reached by the district court is that OAG's complaint sufficiently pleaded that defendants' products met the federal definition (J.A. 180). Without a factual record about the nature of the products sold by defendants, this Court will be forced to predict whether the evidence will ultimately establish that defendants are even entitled to assert a PLCAA defense. Such a task is entirely inappropriate on collateral-order review. *See In re Agent Orange Prod. Liab. Litig.*, 745 F.2d 161, 164 (2d Cir. 1984); *see also Anderson v. City of Boston*, 244 F.3d 236, 240 (1st Cir. 2001).

Likely recognizing this flaw in their jurisdictional argument, defendants ask this Court to also exercise "pendent" appellate jurisdiction over the issue of whether their products are "firearms" under federal law. They argue that the PLCAA question is appealable, and the "firearms" question is reviewable on the ground that it is ancillary to that. *See* Br. at 20-22. But defendants have the jurisdictional question backwards. Pendent jurisdiction is a discretionary doctrine by which appellate courts can review ancillary questions that arise from an independently appealable issue. *Blue Ridge Invs., L.L.C. v. Republic of Argentina*, 735 F.3d 72, 81 (2d Cir. 2013); *see also* 16 Charles Alan Wright, Arthur R. Miller &

Edward H. Cooper, Federal Practice and Procedure § 3937 (3d ed., June 2024 update) (Westlaw). The doctrine does not allow parties to ask appellate courts to manufacture an appealable order by first answering an otherwise unappealable question.

Second, defendants are wrong to argue that the denial of their PLCAA defense at the pleading stage is akin to the denial of an immunity from suit that is unreviewable after final judgment. *See* Br. at 15-19. The analysis here turns on whether PLCAA confers "a right whose remedy requires the dismissal of charges" or "a right not to be tried." *See Midland Asphalt Corp.*, 489 U.S. at 801 (quotation marks omitted); *Liberty Synergistics Inc. v. Microflo Ltd.*, 718 F.3d 138, 147 (2d Cir. 2013). The former may provide a complete bar to liability but does not separately entitle the defendant to immediate appeal when it is rejected—rightly or wrongly—at an interlocutory stage of the litigation. *Midland Asphalt Corp.*, 489 U.S. at 801; *see also Van Cauwenberghe v. Biard*, 486 U.S. 517, 525 (1988). The latter, in contrast, allows for an immediate appeal because the right "rests upon an *explicit* statutory or constitutional guarantee that trial will not occur" such as a motion to dismiss on grounds of double jeopardy, *Midland Asphalt Corp.*, 489 U.S. at 801 (emphasis added); *see Abney v.*

63

*United States*, 431 U.S. 651, 659-60 (1977), or upon a claim of absolute or qualified immunity, *Nixon v. Fitzgerald,* 457 U.S. 731, 742 (1982); *Mitchell v. Forsyth,* 472 U.S. 511, 530 (1985). In assessing a claimed right not to stand trial, courts must examine the nature of the right asserted with "skepticism, if not a jaundiced eye," *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 873 (1994), to determine whether an "essential aspect of the claim" is the right to avoid trial, *Van Cauwenberghe*, 486 U.S. at 525.

PLCAA's text clearly indicates that Congress intended to provide an affirmative preemption defense, not an explicit statutory guarantee of exemption from trial. *See Digital Equip. Corp.*, 511 U.S. at 874. In setting out its findings, Congress explained that certain firearms businesses "are not, and should not, *be liable* for the harm caused by those who criminally or unlawfully misuse firearm products or ammunition products that function as designed and intended," not that they should not face even the specter of litigation. 15 U.S.C. § 7901(a)(5) (emphasis added); *see also id.* § 7901(a)(6). Congress likewise sets out as its very first purpose an intent "[t]o prohibit *causes of action* against manufacturers, distributors, dealers, and importers of firearms or ammunition products, and their trade associations, for the harm solely caused by the criminal or unlawful

64

misuse" of a third-party. *Id.* § 7901(b)(1) (emphasis added). By contrast, when Congress means to confer an immunity from trial, it does so expressly by, for example, providing that "a foreign state *shall be immune from the jurisdiction of the courts* of the United States and of the States," 28 U.S.C. § 1604 (emphasis added); *see also* 49 U.S.C. § 30502(f) ("immune from any civil action").

Defendants claim that Congress intended to confer on them an explicit right not to be tried because PLCAA uses the phrase "may not be brought" when referring to the "qualified civil liability action[s]" preempted by the statute. Br. at 16 (quoting 15 U.S.C. § 7902(a)). But a statutory prohibition on bringing a particular action does not necessarily confer a right not to stand trial. For example, a motion to dismiss on statute of limitations grounds can similarly be framed in terms of a statutory prohibition on bringing certain actions—yet it is well-established that a denial of such a defense does not give rise to an immediate appeal. *See Digital Equip. Corp.*, 511 U.S. at 873; *see United States v. Weiss*, 7 F.3d 1088, 1090 (2d Cir. 1993). Defendants' mere "agility" in characterizing PLCAA's liability protections cannot be a basis for determining the jurisdiction of the courts of appeals. *Digital Equip. Corp.*, 511 U.S. at 864.

65

Nor is there any merit to defendants' argument (Br. at 15-16) that PLCAA's protections are "indistinguishable" from qualified immunity or sovereign immunity. It is well-established that collateral-order appeals are necessary to protect the "substantial public interest" imperiled absent these doctrines, *Will*, 546 U.S. at 352, such as ensuring public officials may "perform their duties . . . without constant dread of retaliation," *Amore v. Novarro*, 624 F.3d 522, 530 (2d Cir. 2010), or protecting the "States' solvency and dignity," *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 52 (1994). PLCAA's interest in shielding certain gun-industry members from liability for third-party misuse of their products does not give rise to the same institutional concerns.

Finally, defendants are wrong to suggest (Br. at 18-19) that this Court or the Ninth Circuit have recognized PLCAA as conferring a right not to be tried. Although this Court remarked in passing in *Beretta* that PLCAA "immunizes" certain defendants from qualified civil liability actions, 524 F.3d at 398, that statement had no bearing on the Court's holding, and this Court later recognized that PLCAA simply confers a "complete defense" against certain qualified civil liability actions, *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 125 (2d Cir. 2011).

Likewise, the Ninth Circuit's passing use of the term "immunity" in a case involving other issues pertaining to PLCAA, *Ileto*, 565 F.3d at 1142, is in no way a holding about the appellate jurisdictional implications of the denial of a PLCAA defense at the pleading stage.

## CONCLUSION

Based on the foregoing, this Court should affirm the district court's denial of defendants' motions to dismiss, or in the alternative, dismiss this interlocutory appeal for lack of appellate jurisdiction.

Dated:  New York, New York
        July 10, 2024

Respectfully submitted,

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for Plaintiff-Appellee


By:   */s/ Kwame N. Akosah*
     KWAME N. AKOSAH
     Assistant Solicitor General

     28 Liberty Street
     New York, NY 10005
     (212) 416-8025

BARBARA D. UNDERWOOD
  *Solicitor General*
ESTER MURDUKHAYEVA
  *Deputy Solicitor General*
KWAME N. AKOSAH
  *Assistant Solicitor General*
    *of Counsel*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Emily Paule, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 13,343 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

_/s/ Emily Paule_____